ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
JAN 17 2008
U.S. COURT OF
FEDERAL CLAIMS

CHAPMAN LAW FIRM CO.

Plaintiff,

v.

THE UNITED STATES

Defendant.

CoFC No. 08-39 C
**BID PROTEST**

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**ITS MOTION FOR PRELIMINARY INJUNCTION**

January 17, 2008

James S. DelSordo, Esq.
Argus Legal, LLC
9255 Center St.
Suite 307
Manassas, VA 20110
(703) 368-8770
fax (703) 368-8772

Counsel for Plaintiff Chapman Law Firm Co.

## TABLE OF CONTENTS

I. Question Presented.....2

II. Statement of the Case.....2

A. The Prior Procurement for These Services.....2

B. HUD Hindered CLF's Start-up and Performance.....5

C. Improper Performance Evaluation.....6

III. Argument.....10

A. Standard of Relief.....11

B. It is Likely that CLF Will Succeed on the Merits in this Litigation.....11

1. HUD has Improperly Limited the Competition.....11

2. HUD's Interpretation of ¶ H.2 is Erroneous.....12

C. CLF will Suffer Immediate Irreparable Injury.....13

D. The Harm to CLF Far Outweighs the Harm to HUD or any Other Entity.....13

E. It is in the Public's Interest to Grant the Injunction.....14

IV. Conclusion.....15

# TABLE OF AUTNORITIES

## I. Statutes and Regulations

41 U.S.C. § 253 ............ 1, 11, 12

48 C.F.R. § 6.101 ............ 11, 14

48 C.F.R. § 6.302-2(a)(2) ............ 11

48 C.F.R. § 6.301(c) ............ 12

## II. Caselaw

SDS International, Inc. v. United States, 55 Fed. Cl. 363 (2003) ............ 11

Cincom Systems, Inc. v. United States, 37 Fed. Cl. 266 (1997) ............ 11

SOS Int'l Ltd., B-296984 *et. al.,* Nov. 14, 2005, 2005 CPD ¶ 206 ............ 12

Bauch & Lomb, Inc., B- 298444, Sept. 21, 2006, 2006 WL 2711794 (Comp.Gen.) ............ 12

Aerolease Long Beach & Satsuma Investment, Inc. v. United States, 31 Fed. Cl. 342 (1994) .... 13

National Maritime Union of America v. Commander, MSC, 824 F.2d 1228 (D.C. Cir. 1987) ... 13

O'Donnell Construction Co. v. District of Columbia, 963 F.2d 420 (D.C. Cir. 1992) ............ 13

Varicon International, *et al.* v. Office of Personnel Management, 934 F. Supp. 440 (D.D.C. 1996) ............ 13

Alion Science and Technology Corp. v. Untied States, 74 Fed. Cl. 372, 376 (2006) ............ 14

Overstreet Elec. Co. v. United States, 47 Fed. Cl. 478, 480 (2001) ............ 14

Logicon, Inc. v. United States, 22 Cl. Ct. 776 (1991) ............ 14

**COMES NOW** the Chapman Law Firm Co. ("CLF"), by and through undersigned counsel, and hereby protests the United States Department of Housing and Urban Development's ("HUD's") Request for Proposals for Single Family Home Marketing & Management ("M&M") Services in Ohio and Michigan. CLF files this action in order to object to HUD's failure to comply in this procurement with the requirements of the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253 and ¶ H.2, Option to Increase the Geographic Service Area, of the existing M&M contracts.

Specifically, HUD's proposed procurement is defective because the agency has restricted the competition to a few current M&M contractors excluding CLF among others. HUD's exclusion of CLF is arbitrary and capricious and is based on fallacious information concerning CLF's performance as the incumbent contractor for the services sought in this procurement. Also HUD has not properly justified this limitation on competition and any need for the restricted competition is based on HUD's failure to properly plan for or manage these services. Furthermore, ¶ H.2 requires that any M&M contractor that takes over another contractor's service areas must perform those services at the price proposed by the existing contractor for that area. Despite this restriction and in violation of the M&M contract HUD is seeking new pricing proposals from the limited offeror pool.

By this filing, and the accompanying Complaint for Injunctive and Declaratory Relief, CLF seeks an order enjoining the Government from taking the actions described above or in the alternative enjoining HUD from conducting a competition for these services without including CLF. Finally, CLF also seeks its attorney's fees and its costs in bringing this action.

## I. Question Presented

1. Is HUD's exclusion of CLF from this procurement arbitrary and capricious?

2. Is HUD's interpretation of M&M Contract ¶ H.2 in error and arbitrary and capricious?

## II. Statement of the Case

### A. The Prior Procurement for These Services

On or about September 5, 2003, CLF submitted its original Proposal to provide Management and Marketing Services for the states of Ohio and Michigan in response to Request for Proposals No. R-OPC-22505 (the "2003 RFP"). A lengthy series of written negotiations, proposal revisions and protests followed. On September 30, 2005, CLF was awarded Contract No. C-PHI-00958, under the 2003 RFP for the management and marketing of single family homes for the states of Ohio and Michigan (the "M&M Contract"). The M&M Contract had a start date of October 1, 2006. This award decision was protested by Greenleaf Construction Co., Inc. ("Greenleaf").

Subsequently, the Government Accountability Office ("GAO") issued a decision in the case of *Greenleaf Construction Company, Inc.* (January 17, 2006), File B-293105.18; B-293105.19 ("GAO Decision") that recommended that HUD provide clarification related to certain changes in personnel, software and business structure since CLF's Final Proposal Revisions ("FPR").[1]

Following the GAO Decision, HUD made absolutely no attempt to initiate communications with CLF or to request additional information from CLF regarding any of the

[1] The GAO Decision did not disturb the award to CLF or recommend termination of the M&M Contract.

items raised in the GAO Decision. On January 26, 2006, Frank Chapman called Contracting Officer Brenda Thomas in an attempt to find out HUD's intentions and initiate a dialogue regarding the M&M Contract. Ms. Thomas provided no additional information. Frank Chapman followed up with an emailing, also on January 26, stating, "Thank you for speaking with me. I look forward to hearing from you shortly."

After hearing nothing from HUD, on January 27, 2006, on its own initiative, CLF sent a comprehensive letter to HUD detailing how it had adequately and comprehensively addressed each and every concern raised in the GAO Decision, offered to provide any additional information required and reiterated that CLF was ready, willing and able to perform under the M&M Contract.

HUD provided no response to CLF following the letter of January 27, 2006 and did not, on any occasion, ask CLF for additional information or assistance in responding to the GAO Decision. In addition to the letter sent by CLF on January 27, 2006, CLF successfully passed a Modified Condition Risk Assessment conducted by the Defense Contract Audit Agency, an independent third-party auditor. The results of this Audit were reported to Nicole Hunt, Contract Specialist *and* Maureen Musilli, Contracting Officer, as well as other HUD officials, on March 13, 2006.

At approximately 4:28 p.m. on April 19, 2006, *without any prior warning or discussion*, CLF received an advisement that the M&M Contract had been "terminated for convenience" and that "Funding in the amount of $29,644,228 is de-obligated from the contract." On April 19, 2006 HUD notified the GAO by letter that it would not be providing a report relating to the GAO Decision as the procurement had been cancelled and, therefore, the GAO Decision was irrelevant.

On April 19, 2006 a new pre-solicitation notice of procurement for management and marketing services was posted on FedBizOpps.gov seeking a contract to provide exactly the same, or inferior, services CLF was ready, willing and able to provide under the M&M Contract. On April 21, 2006 the new procurement was taken down from the FedBizOpps.gov website.

CLF was told by Contracting Officer Maureen Musilli, on April 20, 2006, that HUD was terminating the M&M Contract due to an alleged "change in circumstances" caused by the increase in the number of HUD properties in Ohio and Michigan since the original contract procurement. In the same conversation, Maureen Musilli also indicated that the reason the Termination for Convenience had taken so long was because she was required to complete the market research concerning the projected volume of conveyances that would occur in the future, which obviously indicated that HUD was actively searching for any reason to terminate CLF's Contract. No explanation was provided to CLF at the time of the termination of the M&M Contract and at no time did HUD discuss the termination of the Contract with CLF or ask CLF for additional information of any kind.

Subsequently, CLF filed suit in the Court of Federal Claims, the case was styled Chapman Law Firm Co. v. United States, CoFC No. 06-330C (Judge Wheeler). Although HUD indicated it would take corrective action and award the contract to CLF, Judge Wheeler instead instructed HUD to hold a competition between CLF and Greenleaf (a competing contractor that was previously removed from competition due to a size protest) to obtain the "best value" for the Government. CLF and Greenleaf both subsequently submitted proposals for evaluation.[2] *See*

[2] To successfully re-compete in this competition, CLF was forced to significantly reduce its original contract price.

Chapman Law Firm Co. v. United States, No. 06-CV-330 (Fed. Cl. June 20, 2006) ("Chapman II")

On December 19, 2006 Maureen Musilli sent CLF a letter indicating that CLF's proposal for M&M services had been accepted and it was to start performance January 1, 2007. CLF's performance was stopped by a new protest to the GAO filed by Greenleaf. The protest was denied and on April 15, 2007, without any prior warning, CLF was instructed to commence performance immediately.

On Friday December 28, 2007, after a little over eight months of performance, without any explanation, CLF was told that the option to renew its contract was not being exercised and that CLF should begin the contract provided sixty day "transition out." This occurred despite CLF being told in October 2007 that HUD intended to exercise the option.

**B. HUD Hindered CLF's Start-up and Performance**

As stated above, on April 15, 2007, without prior warning, CLF was told to commence performance of the M&M Contract. CLF was not given the ordinary and contract required 60-day "start-up" or "ramp-up" (days 61 through 136) periods provided in the Contract and provided to all other Management and Marketing Contractors.

By arrangement with HUD and the prior Contractor, CLF agreed to begin listing HUD homes on its contract required-website for public sale on May 16, 2007. CLF launched its property sales website on the morning of May 16, 2007, but was very shortly thereafter told to take it down as it had not been reviewed and approved by HUD's GTR.

HUD subsequently did not allow CLF to begin marketing or selling HUD properties until June 22, 2007. In the intervening time, CLF was forced to acquire additional inventory and expense increasing inventory by more than 1500 more homes.

CLF submitted all performance plans in advance of the Contract requirement. However, HUD did not approve CLF performance plans in a timely manner and prior to approval, HUD's GTR required changes to CLF's marketing plan that raised thresholds, increased time between price reductions and adversely affected CLF's ability to sell properties in a timely fashion.[3]

HUD did not enforce performance requirements with the prior contractor and, consequently, the lack of oversight caused the majority of the inventory transferred to CLF when it began contract operations to be in disrepair, dirty, damaged and requiring significant clean-out and maintenance efforts by CLF for the properties to be made ready to market.

The majority of the properties transitioned to CLF had inaccurate or expired appraisals. In fact, more than five hundred and fifty on the properties transferred to CLF by the prior contractor had expired appraisals and hundreds had not been appraised for years, with dozens having appraisals as much as two or three years old. Based on the foregoing CLF was held to a much different standard than the prior contractor subjecting CLF to a continuously moving goal post.

**C. <u>Improper Performance Evaluation</u>**

From the beginning of CLF's contract performance HUD improperly evaluated CLF and intentionally penalized CLF to create "unacceptable" scorecard ratings that did not accurately reflect CLF's true performance. CLF received scorecards for July, August, September, October,

---

[3] CLF's marketing plan was submitted on May 8, 2007 and not approved until July 25, 2007.

November and December of 2007. See Exhibit 1, Declaration of Frank Chapman ("Chapman Dec.") at ¶ 27; See Exhibit 2, Declaration of John Goss at ¶¶ 8-11.

HUD based its scorecards upon evaluations conducted by its Government Technical Representative, Cliff Kellett, who was inexperienced and committed numerous errors in his evaluation of CLF managed properties. Examples of these errors include using the wrong key to attempt to gain access to a HUD property (then citing CLF for improper locks), arbitrarily penalizing CLF for items that were not contract requirements and counting inappropriate items (not outlined in the Contract) as health and safety hazard counted against CLF's score as well as taking pictures of the wrong houses. Although CLF has provided contemporaneous documentation and support for its position the Government has refused to consider CLF's position or modify its scores. Chapman Dec. at ¶ 28.

HUD intentionally penalized CLF by including the prior contractor's inventory in most of CLF's marketing performance requirements. In other words, the time the prior contractor held properties in inventory without a sale was counted in CLF's rating. For instance, in the July 2007 scorecard, when CLF had been performing since April 15, 2007 (107 days through July), HUD determined CLF's rating for the Critical Performance element "Properties Sell Quickly – Average Holding Time" to be 264 days resulting in an unacceptable rating. CLF would have easily passed this requirement (the requirement calls for average holding time of 150 days or less) if the prior contractor's performance was not included. This is a violation of CLF's contract as the Contract requires the performance measure is from "acquisition" to settlement and the first day CLF acquired any properties was April 15, 2007. Id. at ¶ 30.

Another example of HUD's improper administration of the Contract occurred in the November 2007 scorecard; HUD gave CLF a score of 0% for the Critical Performance Item

"Contract Responds Appropriate and Timely to Customer Inquiries." HUD claimed the communications log upon which the rating is based was not posted to CLF's contract required Electronic Management System ("EMS"). CLF immediately demonstrated to HUD that the information was not found due to user error by HUD's reviewer but was, in fact, there on time as required. Despite this, HUD refused to correct CLF's performance score. The prior two months CLF had received ratings of "good" and would have passed this element if HUD had corrected its mistake.

Although CLF consistently pointed out errors in HUD's evaluation, HUD did not correct this practice and CLF continued to be penalized and have its performance number grossly distorted. CLF refuted HUD's improper evaluations and repeatedly requested that that HUD correct the improper scorecards and provided documentation and photographic evidence to support its request. CLF did this consistently following receipt of every scorecard.

CLF also participated in conference calls with HUD to address the scorecards and reiterated that the scoring was unfair and improper. CLF was told by both the Government Technical Representative Cliff Kellett and Contracting Officer Maureen Musilli that HUD would not reconsider or correct the scores.

The scorecards manufactured by HUD do not accurately reflect CLF's real world performance. CLF has improved the condition of HUD properties, reduced holding times and was on a sharply increasing sales trend when its Contract was not renewed. CLF dramatically increased its total sales in the eight months it was allowed to sell properties despite the worst housing market in recent memory and the fallout of the mortgage industry. For example, during the month of December 2007 during what is traditionally the slowest month for real estate sales and in the one of the worst housing markets in history and in the midst of the collapse of the

mortgage industry, CLF sold 519 properties despite these terrible conditions. This is more properties than the prior M&M Contractor sold in December of 2006[4] in a strong real estate market with ready financing.

CLF also dramatically improved community relations and participation in the HUD Dollar Homes program causing numerous cities and counties to participate in the program and receiving positive press coverage for HUD in several newspaper articles in Ohio and Michigan. See Exhibit 3, Declaration of Cameron G. Priebe, Mayor of the City of Taylor, Michigan at ¶¶ 5-8; Exhibit 4, Declaration of Derek Gasiorowski at ¶¶ 5-13.

CLF learned about HUD's new procurement through HUD's counsel and then contacted the Contracting Officer Maureen Musilli to inquire. When CLF asked for a copy of the request for proposals submitted to select other management and marketing contractors CLF's request was denied. CLF was also told by Maureen Musilli that CLF could not bid due to HUD's improper impression of CLF's past performance. Upon information and belief, HUD had not determined to follow this course of action before deciding to not exercise CLF's option; rather, the decision to pursue the current procurement course was made after January 1, 2008.

CLF also learned from HUD's counsel that the agency's mechanism for awarding the additional Michigan and Ohio regions to the successful existing M&M contractors was through ¶ H.2, Option to Increase the Geographic Service Area, of the existing M&M contracts. This clause states:

> The Government may unilaterally increase the geographic service areas of this contract, by contract modification. The prices for the services ordered in the increased service areas shall be those previously negotiated for those geographic areas and in effect for the ordering period during which the

[4] HUD's internal database, SAMS, reports indicate that in December 2006 the prior contractor Michaelson, Connor and Boul sold a total of 509 properties.

services are ordered. If any such change causes an increase or decrease in the previously negotiated prices, the contractor must assert its right to an equitable adjustment within 30 days from the date of receipt of the written unilateral change.

Despite the clear requirement of ¶ H.2 that the new contractor must take over the new areas at the prices previously proposed by the prior contractor, HUD is permitting the offerors in this procurement to submit new pricing proposals.

CLF is fully operational and remains ready willing and able to perform all of the duties in its contract and, contrary to HUD's improper claim and unjustified ratings, CLF is capable of performing and is in the best position to fulfill HUD's requirements in Ohio and Michigan.

## III. Argument

CLF's case meets each of the injunction factors applied by the U.S. Court of Appeals for the Federal Circuit. Plaintiff has a high likelihood of success on the merits of its claims, and it will suffer irreparable injury in the absence of the requested injunctive relief. Moreover, granting the relief requested will serve the public interest, without harming HUD or any other interested party. Therefore, CLF is entitled to injunctive relief:

1. Enjoining HUD from permitting performance of any contract under the solicitation.
2. Or in the alternative enjoining HUD from employing the funds obligated to the performance of any contract awarded under the solicitation to any entity other than CLF.
3. That CLF be permitted to compete in the procurement for these services.
4. That HUD amend the solicitation to reflect that offerors must offer to perform the services at CLF's previously proposed price.
5. That in any event CLF be awarded its reasonable costs and attorneys' fees and such further relief as is determined just and fair.

## A. Standard of Relief

In considering a motion for a preliminary injunction, this Court applies the following criteria:

(1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;

(2) the likelihood that the plaintiff will succeed on the merits; and

(3) whether a preliminary injunction will be contrary to the public interest.

See SDS International, Inc. v. United States, 55 Fed. Cl. 363 (2003); Cincom Systems, Inc. v. United States, 37 Fed. Cl. 266 (1997).

## B. It is Likely that CLF Will Succeed on the Merits in this Litigation.

### 1. HUD has Improperly Limited the Competition

The Competition in Contracting Act requires Government agencies promote full and open competition in seeking proposals for supplies and services. See 48 C.F.R. § 6.101. Although there are exceptions to the requirement for full and open competition, see 48 C.F.R. Subparts 6.2 and 6.3, upon information and belief those exceptions do not apply here or HUD has not properly justified the use of these exceptions. Rather the record is clear that HUD decided that it no longer desired to procure these services from CLF and without advance planning or forethought HUD decided to not exercise CLF's option without an alternative procurement plan.

An executive agency may use procedures other than competitive procedures only when the agency's need for the property or services is of such an unusual and compelling urgency that the Government would be seriously injured unless the executive agency is permitted to limit the number of sources from which it solicits bids or proposals. See 41 U.S.C. § 253(c)(2); 48 C.F.R. § 6.302-2(a)(2). This exception only allows an agency to "limit the number of sources," so that

an agency may not simply ignore the potential for competition. See SOS Int'l Ltd., B-296984 *et. al.*, Nov. 14, 2005, 2005 CPD ¶ 206. In addition, CICA provides that under no circumstances may noncompetitive procedures be used due to a lack of advance planning by contracting officials or concerns related to the amount of funds available to the agency. See 41 U.S.C. § 253(f)(5)(A); 48 C.F.R. § 6.301(c); see also Bauch & Lomb, Inc., B- 298444, Sept. 21, 2006, 2006 WL 2711794 (Comp.Gen.).

According to HUD's contracting officer CLF is not permitted to participate in this procurement because of CLF's performance for the last eight months in the exact same areas for which HUD now seeks offers. As we have stated above HUD's administration of CLF's contract was a morass of shifting standards and HUD's failure to properly review CLF's performance. Despite CLF's presentation of substantial evidence of its acceptable and even superior performance, HUD has refused to consider this information. Despite CLF's supposedly defective performance, CLF has sold more homes for HUD in the face of the worst real estate market in recent memory in two of the most depressed economies in the United States, and HUD has neither terminated CLF for default nor sought to suspend CLF as a contractor.

The bottom line is that HUD has once again failed to keep faith with CLF and has decided it just does not want to do business with CLF, and HUD has made a back door decision to black ball CLF. This is not proper and it cannot be permitted.

**2. HUD's Interpretation of ¶ H.2 is Erroneous**

HUD's mechanism for awarding the additional Michigan and Ohio regions to the successful existing M&M contractors was through ¶ H.2, Option to Increase the Geographic Service Area, of the existing M&M contracts. This clause states:

> The Government may unilaterally increase the geographic service areas of this contract, by contract modification. The prices for the services ordered in the increased service areas shall be those previously negotiated for those geographic areas and in effect for the ordering period during which the services are ordered. If any such change causes an increase or decrease in the previously negotiated prices, the contractor must assert its right to an equitable adjustment within 30 days from the date of receipt of the written unilateral change.

Despite the clear requirement of ¶ H.2 that the new contractor must take over the new areas at the prices previously proposed by the prior contractor, HUD is permitting the offerors in this procurement to submit new pricing proposals.

**C. CLF will Suffer Immediate Irreparable Injury.**

Absent granting of the requested injunctive relief, CLF will suffer the loss of the opportunity to perform under the RFQ or to participate in a balanced and equitable procurement process. Many Courts have found that plaintiffs would be irreparably injured in the face of much more speculative harms. See Aerolease Long Beach & Satsuma Investment, Inc. v. United States, 31 Fed. Cl. 342 (1994); National Maritime Union of America v. Commander, MSC, 824 F.2d 1228 (D.C. Cir. 1987); O'Donnell Construction Co. v. District of Columbia, 963 F.2d 420 (D.C. Cir. 1992); Varicon International, *et al.* v. Office of Personnel Management, 934 F. Supp. 440 (D.D.C. 1996) (plaintiff would be irreparably injured by the loss of its opportunity to participate in a procurement process free from taint). Clearly, the loss of CLF's ability to receive the benefits of its participation in a competitive procurement is an irreparably injury.

**D. The Harm to CLF Far Outweighs the Harm to HUD or any Other Entity**

As the Court has previously stated balancing the hardships requires consideration of the harms that injunctive relief would impose on the Government with the issuance of the injunctive relief supported if the hardship to the Plaintiff is the greater. See Alion Science and Technology

Corp. v. Untied States, 74 Fed. Cl. 372, 376 (2006); Overstreet Elec. Co. v. United States, 47 Fed. Cl. 478, 480 (2001). Clearly here the balance of harms must tilt towards the Plaintiff. The Competition in Contracting Act requires Government agencies promote full and open competition in seeking proposals for supplies and services. See 48 C.F.R. § 6.101.

Although there are exceptions to the requirement for full and open competition, see 48 C.F.R. Subparts 6.2 and 6.3, upon information and belief those exceptions do not apply here or HUD has not properly justified the use of these exceptions. Rather the record is clear that HUD decided that it no longer desired to procure these services from CLF and without advance planning or forethought HUD decided to not exercise CLF's option without an alternative procurement plan.

**E. It is in the Public's Interest to Grant the Injunction.**

It is beyond a doubt that the public's interest lies in its ability to have faith in the procurement process and for offeror's to receive an effective remedy when the Government violates those rules. As the Court of Federal Claims stated in Logicon, Inc. v. United States, 22 Cl. Ct. 776 (1991), the concept of a level playing field is at the heart of the federal procurement system.

Permitting the Government to corrupt the competitive process in the fashion it intends and permitting the continuation of a procurement process that is seriously flawed and improperly excludes interested offerors exposes the Government to needless expense, is contrary to statute, and is simply unfair to the Plaintiff; therefore, the Court should immediately enjoin the Government's course of action.

## IV. Conclusion

Plaintiff respectfully requests that the Court issue an order immediately Plaintiff respectfully requests that the Court issue an order immediately enjoining the Government from taking the actions described above or in the alternative enjoining HUD from conducting a competition for these services without including CLF. Finally, CLF also seeks its attorney's fees and its costs in bringing this action.

Respectfully submitted,

Date: 1/17/08

By: ______________________

James S. DelSordo, Esq.
Argus Legal, LLC
9255 Center St., Suite 307
Manassas, VA 20110
(703) 368-8770

Counsel for Plaintiff Chapman Law Firm Co.

| | |
|---|---|
| CHAPMAN LAW FIRM CO.<br>Plaintiff,<br>v.<br>THE UNITED STATES<br>Defendant. | CoFC No. ____________<br>**BID PROTEST** |

I, Frank H. Chapman II, being duly sworn, depose and say:

1. I am over the age of eighteen years, and I have personnel knowledge of the matters stated herein. This declaration is provided in support of a Protest before the United States Court of Federal Claims.

2. I am the President and sole owner of The Chapman Law Firm Co., LPA ("Chapman Law Firm").

3. On or about September 5, 2003, Chapman Law Firm ("CLF") submitted its original Proposal to provide Management and Marketing Services for the states of Ohio and Michigan. A lengthily series of written negotiations, proposal revisions and protests followed.

4. On September 30, 2005, CLF was awarded the Management and Marketing Contract, C-PHI-00958, for the management and marketing of single family homes for the states of Ohio and Michigan ("M&M Contract"). The M&M Contract had a start date of October 1, 2006.

5. The Government Accountability Office issued a decision in the case of *Greenleaf Construction Company, Inc.* (January 17, 2006), File B-293105.18; B-293105.19 ("GAO Decision") that recommended the Department of Housing and Urban Development ("HUD")



Exhibit 1

provide clarification related to certain changes in personnel, software and business structure since CLF's Final Proposal Revisions ("FPR").[1]

6. Following the GAO Decision, HUD made absolutely no attempt to initiate communications with CLF or to request additional information from CLF regarding any of the items raised in the GAO Decision.

7. On January 26, 2006, Frank Chapman called Contracting Officer Brenda Thomas in an attempt to find out HUD's intentions and initiate a dialogue regarding the M&M Contract. Ms. Thomas provided no additional information. Frank Chapman followed up with an emailing, also on January 26, stating, "Thank you for speaking with me. I look forward to hearing from you shortly."

8. After hearing nothing from HUD, on January 27, 2006, on its own initiative, CLF sent a comprehensive letter to HUD detailing how it had adequately and comprehensively addressed each and every concern raised in the GAO Decision, offered to provide any additional information required and reiterated that CLF was ready, willing and able to perform under the M&M Contract.

9. HUD provided no response to CLF following the letter of January 27, 2006 and did not, on any occasion, ask CLF for additional information or assistance in responding to the GAO Decision.

10. In addition to the letter sent by CLF on January 27, 2006, CLF successfully passed a Modified Condition Risk Assessment conducted by the Defense Contract Audit Agency, an independent third-party auditor. The results of this Audit were reported to Nicole Hunt, Contract

[1] The GAO Decision did not disturb the award to CLF or recommend termination of the M&M Contract.

Specialist *and* Maureen Musilli, Contracting Officer, as well as other HUD officials, on March 13, 2006.

11. At approximately 4:28 p.m. on April 19, 2006, *without any prior warning or discussion*, CLF received an advisement that the M&M Contract had been "terminated for convenience" and that "Funding in the amount of $29,644,228 is de-obligated from the contract."

12. On April 19, 2006 HUD notified the GAO by letter that it would not be providing a report relating to the GAO Decision as the procurement had been cancelled and, therefore, the GAO Decision was irrelevant.

13. On April 19, 2006 a new pre-solicitation notice of procurement for management and marketing services was posted on FedBizOpps.gov seeking a contract to provide exactly the same, or inferior, services CLF was ready, willing and able to provide under the M&M Contract.

14. On April 21, 2006 the new procurement was taken down from the FedBizOpps.gov website. Affiant was told by Philadelphia Area Office Contracting Officer Maureen Musilli that this procurement was stopped by Attorney Robert Brown from the Office of the General Counsel in Washington, D.C. due to his belief that the Termination for Convenience may be improper.

15. CLF was told by Contracting Officer Maureen Musilli, on April 20, 2006, that HUD was terminating the M&M Contract due to an alleged "change in circumstances" caused by the increase in the number of HUD properties in Ohio and Michigan since the original contract procurement.

16. In the same conversation, Maureen Musilli also indicated that the reason the Termination for Convenience had taken so long was because she was required to complete the

market research concerning the projected volume of conveyances that would occur in the future, which obviously indicated that HUD was actively searching for any reason to terminate CLF's Contract.

17. No explanation was provided to CLF at the time of the termination of the M&M Contract and at no time did HUD discuss the termination of the Contract with CLF or ask CLF for additional information of any kind.

18. CLF filed suit in the Court of Federal Claims. Although HUD indicated it would take corrective action and award the contract to CLF, the Federal Judge instead instructed HUD to hold a competition between CLF and Greenleaf Construction Co. (a competing contractor that was previously removed from competition due to a size protest) to obtain the "best value" for the Government. CLF and Greenleaf both subsequently submitted proposals for evaluation.[2] *See* Chapman Law Firm Co. v. United States, No. 06-CV-330 (Fed. Cl. June 20, 2006) ("Chapman II")

19. On December 19, 2006 Maureen Musilli sent CLF a letter indicating that CLF's proposal for M&M services had been accepted and it was to start performance January 1, 2007.

20. CLF's performance was stopped by a protest to the Government Accountability Office filed by Greenleaf Construction Co. The protest was denied and on April 15, 2007, without any prior warning, CLF was instructed to commence performance immediately.

21. On December 31, 2007, after a little over eight months of performance, without any explanation, CLF was told that the option to renew its contract was not being exercised and that CLF should begin a sixty day "transition out." This occurred despite CLF being told in October 2007 that HUD intended to exercise the option.

[2] To successfully re-compete in this competition, CLF was forced to significantly reduce its original contract price.

**HUD HINDERED CLF START-UP**

22. On April 15, 2007, without prior warning, CLF was told to commence performance of the M&M Contract. CLF was not given the ordinary 60-day "start-up" or "ramp-up" (days 61 through 136) periods provided in the Contract and provided to all other Management and Marketing Contractors.

23. By arrangement with HUD and the prior Contractor, CLF agreed to begin listing HUD homes on its site for public sale on May 16, 2007. CLF launched its property sales website on the morning of May 16, 2007, but was very shortly thereafter told to take it down as it had not been reviewed and approved by HUD's GTR.

24. HUD subsequently did not allow CLF to begin marketing or selling HUD properties until June 22, 2007. In the intervening time, CLF was forced to acquire additional inventory and expense increasing inventory by more than 1500 more homes.

25. CLF submitted all performance plans in advance of the Contract requirement. However, HUD did not approve CLF performance plans in a timely manner and prior to approval, HUD's GTR required changes to CLF's marketing plan that raised thresholds, increased time between price reductions and adversely affected CLF's ability to sell properties in a timely fashion.[3]

26. HUD did not enforce performance requirements with the prior contractor and, consequently, the lack of oversight caused the majority of the inventory transferred to CLF when it began contract operations to be in disrepair, dirty, damaged and to require significant clean-out

[3] CLF's marketing plan was submitted on May 8, 2007 and not approved until July 25, 2007.

and maintenance efforts by CLF to be made ready to market.

27. The majority of the properties transitioned to CLF had inaccurate or expired appraisals. In fact, more than five hundred and fifty on the properties transferred to CLF by the prior contractor had expired appraisals and hundreds had not been appraised for years, with dozens having appraisals as much as two or three years old.

28. CLF was held to a much different standard than the prior contractor subjecting CLF to a continuously moving goal post.

**IMPROPER PERFORMANCE EVALUATION**

27. From the beginning of CLF's contract performance HUD improperly evaluated CLF and intentionally penalized CLF to create "unacceptable" scorecard ratings that did not accurately reflect CLF's true performance. CLF received scorecards for July, August, September, October, November and December of 2007.

28. HUD based its scorecards upon evaluations conducted by its Government Technical Representative, Cliff Kellett, who was inexperienced and committed numerous errors in his evaluation of CLF managed properties.

29. Examples of these errors include using the wrong key to attempt to gain access to a HUD property (then citing CLF for improper locks), arbitrarily penalizing CLF for items that were not contract requirements and counting inappropriate items (not outlined in the Contract) as health and safety hazard counted against CLF's score as well as taking procures of the wrong houses. Although CLF has provided contemporaneous documentation and support for its

position the Government has refused to consider CLF's position or modify its scores.

30. HUD intentionally penalized CLF by including the prior contractor's inventory in most of CLF's marketing performance requirements. In other words, the time the prior contractor held properties in inventory without a sale was counted in CLF's rating. For instance, in the July 2007 scorecard, when CLF had been performing since April 15, 2007 (107 days through July), HUD determined CLF's rating for the Critical Performance element "Properties Sell Quickly – Average Holding Time" to be 264 days resulting in an unacceptable rating. CLF would have easily passed this requirement (the requirement calls for average holding time of 150 days or less) if the prior contractor's performance was not included. This is a violation of CLF's contract as the Contract requires the performance measure is from "acquisition" to settlement and the first day CLF acquired any properties was April 15, 2007.

31. Another example occurred in the November 2007 scorecard; HUD gave CLF a score of 0% for the Critical Performance item "Contract Responds Appropriate and Timely to Customer Inquiries." HUD claimed the communications log upon which the rating is based was not posted to CLF's Electronic Management System. CLF pointed out that the information was not found due to user error by HUD's reviewer but was, in fact, there on time as required. Despite this, HUD refused to correct the score. The prior two months CLF had received ratings of "good" and would have passed this element if HUD had corrected its mistake.

32. CLF consistently pointed out HUD's evaluation, but HUD did not correct this practice and CLF continued to be penalized and have its performance number grossly distorted.

33. CLF refuted HUD's improper evaluations and repeatedly requested that that HUD

correct the improper scorecards and provided documentation and photographic evidence to support its request. CLF did this consistently following receipt of every scorecard.

34. CLF also participated in conference calls with HUD to address the scorecards and reiterated that the scoring was unfair and improper. CLF was told by both Government Technical Representative Cliff Kellett and Contracting Officer Maureen Musilli that HUD would not reconsider or correct the scores.

35. The scorecards manufactured by HUD do not accurately reflect CLF's real world performance. CLF has improved the condition of HUD properties, reduced holding times and was on a sharply increasing sales trend when its Contract was not renewed. CLF dramatically increased its total sales in the eight months it was allowed to sell properties despite the worst housing market in recent memory and the fallout of the mortgage industry.

36. In December of 2007 during what is traditionally the slowest month for real estate sales and in the one of the worst housing markets in history and in the midst of the collapse of the mortgage industry, CLF sold 519 properties despite these terrible conditions. This is more properties than the prior M&M Contractor sold in December of 2006[4] in a strong real estate market with ready financing.

37. CLF also dramatically improved community relations and participation in the HUD Dollar Homes program causing numerous cities and counties to participate in the program and receiving positive press coverage for HUD in several newspaper articles in Ohio and Michigan.

38. I learned about HUD's new procurement through HUD's Counsel and then emailed Contracting Officer Maureen Musilli to inquire. When I asked for a copy of the request for

[4] HUD SAMS reports indicate that in December 2006 the prior contractor Michaelson, Connor and Boul sold a total of 509 properties.

proposals submitted to select other management and marketing contractors my request was denied. I was also told by Maureen Musilli that CLF could not bid due to CLF's past performance.

39. CLF is fully operational and remains ready willing and able to perform all of the duties in its contract and, contrary to HUD's improper claim and unjustified ratings, CLF is capable of performing and is in the best position to fulfill HUD's requirements in Ohio and Michigan.

Frther the Declarant sayeth not. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 16, 2008.

FRANK H. CHAPMAN II

| | |
|---|---|
| CHAPMAN LAW FIRM CO.<br>Plaintiff,<br>v.<br>THE UNITED STATES<br>Defendant. | CoFC No. ____________<br>**BID PROTEST** |

I, John Goss, being duly sworn, depose and say:

1. I am over the age of eighteen years, and I have personnel knowledge of the matters stated herein. This declaration is provided in support of a Protest before the United States Court of Federal Claims.

2. I am the Vice President of Operations for the Chapman Law Firm ("CLF") and have served in this capacity since it began performance of the Management and Marketing Contract for Ohio and Michigan for the Department of Housing and Urban Development ("HUD"). In this capacity, I oversee the daily operations of CLF and maintain and oversee the electronic management system used by CLF and its information technology processes.

3. HUD officials including Government Technical Representative Cliff Kellett and Government Technical Manager Patricia Lawlor, routinely marked CLF down in its performance evaluation scorecards because they could not find the information they were seeking to use for evaluation in CLF's electronic management system despite CLF providing training and a user manual.

4. HUD did not seek CLF assistance in finding the information for evaluation, but instead penalized CLF's score. When the contemporaneous documents demonstrating successful performance were provided to HUD they refused to correct the improper scores. For instance, in

Exhibit 2

the November 2007 Scorecard CLF was given a 0% rating for the Performance Requirement "Contractor Responds Appropriately and Timely to Customer Inquiries." Despite the information being present and CLF demonstrating this, HUD refused to correct the score.

5. On prior scorecards, CLF scored "good" ratings of 107% (September 2007) and 106% (October 2007) achieving the Minimum Standard Requirement and would have also passed in November if HUD properly used the EMS system or corrected CLF's score when HUD's error was pointed out.

6. HUD continually requested changes or additions to CLF's EMS system to accommodate their managements' own preferences and which were not required by CLF's Contract. CLF accommodated these request at its own expense and in good faith that HUD would use the system to properly and fairly monitor CLF performance, which HUD did not do.

7. During its operations, CLF has been inspecting properties on average every 15.2 days which is far in excess of the Contract requirement to inspect properties every 25 to 35 days. Despite this, HUD's GTR has repeatedly and inaccurately accused CLF of failing to routinely inspect properties and downgraded CLF's scores. On several occasions HUD's GTR has taken pictures of the wrong property, attempted to use the wrong key to enter a property or cited CLF for something not required by CLF's Contract. In all of these instances HUD's GTR downgraded CLF's score and refused to make a correction when his errors were pointed out and contemporaneously documented.

8. HUD uses a Special Purpose Inspector ("SPI") which reviews a sampling of CLF's properties to report any maintenance, preservation, health or safety issues at the properties under CLF control.

9. During CLF performance HUD's SPI Contractor routinely cited CLF for items and issues that were not proper violations and that should not have counted against CLF ratings. CLF repeatedly brought this to the attention of HUD's GTR who failed to correct the issue. Some items improperly cited by the SPI Contractor include:

a. CLF Boarded up an unsafe doorway that was second point of entry. The Contract only requires the property to have one door that is accessible. However, the SPI counted the second door that was boarded shut for safety against CLF.

b. Boarded up windows were counted against CLF, even though this took place in cities where boarding windows was acceptable and CLF was not required by Contract to replace window paynes.

c. HUD frequently refused to consider CLF photos documenting the correction of reported problems.

d. Another specific example is a handrail was not present at a house that CLF was not, by contract, required to install one and CLF was penalized for this.

Despite CLF repeatedly pointing out these issues to HUD, HUD's GTR continued to penalize CLF in his evaluations rather then correcting the issues or instructing the SPI Contractor to follow proper procedures and guidelines so that CLF could be fairly evaluated.

10. CLF was required to post "SPI Cure" reports describing and documenting how the problems reported by HUD's SPI Contractor were addressed and resolved. CLF consistently corrected the problems and posted the SPI cures in its EMS accurately and timely. However, HUD reviewers were constantly unable to find the reports and therefore gave CLF low scores. This continued to occur despite CLF providing training to HUD personnel and a user manual for

its EMS system. When this was reported to HUD and the documentation to demonstrate CLF's performance, HUD refused to correct the poor evaluations

11. CLF's Contract requires HUD's EMS and SAMS to be congruent within twenty-four hours. Lead Government Technical Representative Bob Contois routinely compared HUD's Single Family Asset Monitoring System ("SAS") data from the prior day to CLF EMS data from the current day and cited CLF for inconsistencies, which is improper as he was comparing data from two different dates and times. Maintaining consistency within twenty-four hours becomes impossible when the prior day's SAMS data is compared to CLF's present day data.

12. For example, HUD once penalized CLF for an incongruence between the two systems on approximately 200 properties. Upon my questioning about this, HUD's Lead GTM stated that SAMS data was "from the day before" and the EMS data used was "from approximately noon the next day" making it impossible for the data to be congruent. HUD did not correct this process even after it was brought to their attention.

Further the Declarant sayeth not. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 17, 2008.

JOHN GOSS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CHAPMAN LAW FIRM CO.

Plaintiff,

v.

THE UNITED STATES

Defendant.

CoFC No. ____________
**BID PROTEST**

**DECLARATION OF CAMERON G. PRIEBE, MAYOR OF THE CITY OF TAYLOR**

I, Cameron G. Priebe, being duly sworn, depose and say:

1. I am over the age of eighteen years, and I have personnel knowledge of the matters stated herein. This declaration is provided in support of a Protest before the United States Court of Federal Claims.

2. I presently serve as the Mayor of the City of Taylor, Michigan and have done so consecutively since 2005.

3. In my capacity as Mayor, I have personal knowledge of the presence and condition of U.S. Department of Housing and Urban Development ("HUD") properties located in my City.

4. Because of the significant problems with Michigan housing market, increasing foreclosures and the effect that vacant homes have on the local economy I continuously monitor the presence, condition and sales of HUD properties located in the City of Taylor both personally and through input and reports from the local government officials in my office and building department.



Exhibit 3

5. During the tenure of The Chapman Law Firm Co., LPA ("CLF") as the Management and Marketing Contractor for HUD, beginning in mid-April of 2007, I have personally experienced and observed considerable improvement in the maintenance and overall condition of HUD properties located in the City of Taylor as well as my City's ability to communicate with and receive assistance regarding HUD properties.

6. Furthermore, relations between HUD's Contractor and the City of Taylor have improved considerably due in large part to CLF's outreach efforts and open dialogue with the City.

7. With CLF's assistance, Taylor has successfully participated in the HUD Dollar Homes program and purchased many HUD homes in its community for rehabilitation and sale to owner-occupants with low-moderate income through its "Taylor Cares" program which has received accolades and positive press.

8. CLF's cooperation and assistance with the City of Taylor has helped improve the community by improving the condition of local housing and making homeownership possible for its low-moderate income residents.

9. I have personally met Frank Chapman on multiple occasions. I met Frank at the Downriver Community Conference in September of 2007, which was a forum for political and community leaders to discuss the foreclosure problem in Michigan. Frank also drove to Taylor to meet with me at my request and again for a press conference for our "Taylor Cares" program when we closed on eleven HUD properties the City purchased. I have found Frank Chapman and CLF staff responsive and ready, willing and able to assist the City of Taylor in all matters pertaining to HUD homes.

10. Based upon my observations and my discussions with leadership in other Michigan cities and with other politicians, I believe CLF has brought about a much needed change that is adding value to the community rather than subtracting it and that Michigan leadership is happy with CLF's performance.

11. I personally feel that CLF is doing a great job and I would like to see them continue as the Management and Marketing Contractor for HUD in the State of Michigan.

Further the Declarant sayeth not. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 16, 2008.

Cameron G. Priebe,
Mayor for the City of Taylor, Michigan

| | |
|---|---|
| CHAPMAN LAW FIRM CO.<br>Plaintiff,<br>v.<br>THE UNITED STATES<br>Defendant. | CoFC No. ___________<br>**BID PROTEST** |

I, Derek Gasiorowski, being duly sworn, depose and say:

1. I am over the age of eighteen years, and I have personnel knowledge of the matters stated herein. This declaration is provided in support of a Protest before the United States Court of Federal Claims.

2. That Declarant previously served as the Director of State Operations for the Management and Marketing Contract held by Michaelson, Connor & Boul ("MCB") for the State of Michigan until approximately April of 2004. Declarant served in this position for approximately five years while MCB was the Management and Marketing ("M&M") Contractor for the Department of Housing and Urban Development for the States of Ohio and Michigan.

3. In my position as Director of State Operations for MCB I was responsible for maintaining property conditions and managing property preservation throughout the entire State of Michigan and have personal knowledge of their operations and the condition of HUD assets while under the MCB Management and Marketing Contract.

4. I have worked with Chapman Law Firm ("CLF") as its Vice President of Property Preservation since August 2005 through the present and I am personally familiar with and oversee the property maintenance and preservation operations for CLF in the State of Michigan.

Exhibit 4

5. The in-house employees that conduct CLF's cleanouts and inspections coupled with CLF's superior equipment and technological advances allow CLF to perform much more efficiently and at a higher standard than the prior contractor and to secure and maintain HUD assets in a cleaner and safer condition than MCB was able to do during my time there.

6. CLF utilizes a large fleet of Global Positioning System equipped Dodge Sprinter Vans with recovery crews and inspectors with Dodge Dakota pick-ups located throughout Michigan and Ohio and monitored and dispatched by a centrally located dispatch center. All of the fleet vehicles are fully equipped for recovery or inspection tasks. This system is much more efficient than the network of subcontractors used by MCB during my time there which was disorganized and often poorly equipped network of subcontractors.

7. CLF's ability to centrally track and dispatch inspectors and recovery crews allows for a faster initial recovery of many more properties per day, more frequent property inspections and much faster response to property issues and health and safety concerns than the prior contractor was able to accomplish.

8. CLF inspectors and recovery crews utilized camera enabled personal digital assistant ("PDA") phones to conduct property inspections, reports and photograph and document the condition of properties. These are sent electronically to headquarters for evaluation. This system is much faster and more efficient than the paper reports MCB used during my time there.

9. CLF's level of staffing both at headquarters and in its Michigan field offices, including its many recovery crews and inspectors, far exceeds that of MCB in Michigan and Ohio during my time there.

10. Based upon my observations and experience, CLF is able to better maintain HUD assets, inspect assets more frequently and address problems and health and safety hazards more quickly than MCB was ever able to do during my time there.

11. During my time at MCB the volume of properties managed was, at its highest, approximately 5,800 and was much lower than that presently managed by CLF, which is currently approximately 10,500 properties.

12. Based upon my personal involvement and that of my subordinates and co-workers, CLF is much more involved in the local communities in Michigan than MCB ever was. Specifically, I have personally attended numerous meetings with many local governments including the cities of Grand Rapids and Detroit, in Michigan.

13. It is my opinion that the overall condition of HUD properties throughout the State of Michigan has improved substantially during CLF's performance of the M&M Contract and my interaction with local government leaders has indicated they are pleased with CLF's performance of the M&M Contract.

Further the Declarant sayeth not. In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 17, 2008.

Derek Gasiorowski

DEREK GASIOROWSKI